# Staunton

## Virginia Transit Company v. Clarence J. Hodges.

September 3, 1959.

Record No. 4967.

Present, Eggleston, C. J., and Buchanan, Miller, Whittle, Snead and l'Anson, JJ.

The opinion states the case.

*Archibald G. Robertson* and *Lewis Thomas Booker* (*L. S. Parsons; Hunton, Williams, Gay, Moore & Powell,* on brief), for the plaintiff in error.

*William N. Eason* and *Philip White* (*H. Warrington Sharp,* on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff, Clarence J. Hodges, was injured when an ambulance in which he was being taken to a hospital collided with a Transit Company bus. He brought this action against the Transit Company and recovered a verdict and judgment from which the Transit Company prosecutes this appeal. It insists that the evidence did not support the verdict and that the court erred in admitting evidence and in giving two instructions.

The accident occurred about 10 p.m. November 2, 1956, within the intersection of City Hall avenue and Church street, in Norfolk. City Hall avenue runs east and west. It is 55.6 feet wide at the intersection and as it enters Church street from the west it has three lanes for eastbound through traffic and a fourth lane for vehicles making a left turn into Church street. Church street at the intersection is 32.8 feet wide and has three lanes. On its west side about ten feet from the curb is a brick wall seven feet high for a distance of about 70 feet north from the intersection. It corners at the intersection and then continues westwardly along the north side of City Hall avenue at a height of three feet two inches. It surrounds St. Paul's churchyard.

The ambulance was going east on City Hall avenue and the bus was going south on Church street. The ambulance struck the bus at about its right rear wheel near the middle of the intersection. The speed limit in that area was 25 miles an hour. The traffic lights at the intersection were red against the ambulance and green for the bus.

The ambulance belonged to the Navy and was being operated by one of its drivers named Lear. It had been dispatched from the Naval Air Station by a Navy doctor to carry the plaintiff Hodges and another patient named Phillips, both of whom had suffered heart attacks, to the Naval hospital in Portsmouth. A Navy corpsman accompanied the driver and had told him that is was an emergency run. The driver turned on the siren and the flashing red light of the ambulance before he left the station and they operated continuously on the trip up to the time of the collision with the bus. The plaintiff Hodges was lying on a stretcher in the ambulance and the other patient, Phillips, was on the front seat with the driver.

An ordinance of the city of Norfolk in effect at the time of the accident provided:

"Upon the approach of any police or fire department vehicle, or ambulance, giving audible signal by siren or exhaust whistle, the driver of every other vehicle shall immediately drive the same to a position at or near as possible and parallel to the right-hand edge or curb, clear of any intersection of highways, and shall stop and remain in such position unless otherwise directed by a police or traffic officer, until the police or fire department vehicle, or ambulance shall have passed. This provision shall not operate to relieve the driver of a police or fire department vehicle or ambulance from the duty to drive with due regard for the safety of all persons using the highway, nor shall it protect the driver of any such vehicle from the consequences of an arbitrary exercise of such right of way."

The main issue in the case is whether the bus driver under the circumstances shown by the evidence negligently violated this ordinance and thereby contributed to the happening of the accident. Whether he was negligent depends on whether he saw or heard or in the exercise of reasonable care should have seen or heard the approaching ambulance in time to stop before entering the intersection. The evidence on this point as the jury could have decided was as follows:

Lear, the driver of the ambulance, testified that he did not remember the condition of the traffic lights and as he approached the intersection at a speed between 20 and 30 miles an hour it appeared to him that all traffic had stopped; the intersection was clear and when he got within 30 to 40 feet of the intersection the bus suddenly pulled out in front of him and he did everything he could to stop.

Phillips, a bank teller and one of the patients in the ambulance, testified that he was sitting beside the driver; that as they were moving up to the intersection and just before they entered it Lear had slowed down to 15 to 20 miles an hour; that Lear applied his brakes when the front of the ambulance was 25 or 30 feet from the Church street cross-walk, at the beginning of the intersection; that when the brakes went on he looked to his left and saw the bus coming into the intersection.

Officers Pugh and Pope of the Norfolk police department witnessed the accident. They had approached the intersection in their patrol car going east on City Hall avenue and were stopping for the red traffic light against them at the intersection They heard the siren

when they were within probably a couple of car lengths from where they stopped. Pugh was driving and when he heard the siren he pulled as far as he could to his right and stopped opposite one of the two or three cars which had stopped in the lane next to him on his right. There was a bus in the next lane to the right, being the lane next to the curb, with some other cars behind it. They first saw the ambulance in their rear-view mirror as it came around the curve in City Hall avenue about 200 feet back of them, with its siren sounding and its red light flashing. They had heard the siren which was clearly audible before they saw the ambulance and when it was perhaps two blocks away. The siren was sounding continuously and got louder at it approached. From the increase of the sound it was apparent that it was approaching them. There was no other traffic in the intersection at the time of the collision.

They first saw the bus as it came into view from behind the brick wall. Pugh pointed out on a map in evidence where this point was but the record does not show its location. He said they saw the bus about the same time they saw the ambulance rounding the curve about 200 feet behind them; but he also said that was when the bus was approaching the intersection and was at the crosswalk line. They estimated the speed of the bus to be between 15 and 20 miles an hour as it entered the intersection and the speed of the ambulance to be 25 to 30 miles an hour as it approached the intersection. The rear of the bus was approximately in the center of the intersection when the ambulance struck it at about its rear wheel. The ambulance laid down skidmarks of about 20 feet to the point of the collision.

On cross-examination Officer Pugh testified that while they heard the siren before they saw the ambulance, they did not know where it was until they saw its red light and when they came up to the intersection they stopped because of the red traffic light, but he added that the chances were they would have stopped at the sound of the siren if there had been no traffic control at all.

The defendant on its part introduced the driver and two occupants of the eastbound bus that had stopped on City Hall avenue at the intersection who testified that they did not hear the siren until the ambulance was about even with their bus; and two doctors who were in an automobile going west on City Hall avenue and had stopped for the red light. They were facing the approaching ambulance and testified that they saw the bus entering the intersection, and at that time they saw the ambulance approaching around the

curve west of the intersection. Its siren was blowing and its red light flashing, and until they saw it they had not seen or heard anything to indicate its approach. One of the doctors said "(t)he bus obstructed our view shortly after the ambulance appeared and then there was the crash, which followed shortly afterward."

In overruling the defendant's motion to strike the plaintiff's evidence at its conclusion the trial court expressed the view that the jury would have a right to conclude that the driver of this bus either heard or in the exercise of reasonable care should have heard this ambulance as it approached the intersection, and added: "When you hear the siren and can tell by the noise that the volume is increasing, then it is your duty to pull off to your right and stop. * * We know that when a siren is approaching us, the volume of sound increases and that thereby you can tell it is approaching."

We agree with that statement both as to the evidence and as to the law.

█ The city ordinance required that upon the approach of the ambulance giving an audible signal by siren it was the duty of the defendant's driver to drive to his right, clear of the intersection, stop and remain there until the ambulance passed. This was his duty even though he had a green light at the intersection. *Cf. Manhattan for Hire Car Corp.* v. *O'Connell,* 194 Va. 398, 73 S. E. 2d 410; *Virginia Transit Co.* v. *Tidd,* 194 Va. 418, 73 S. E. 2d 405. This duty did not arise only in case the ambulance was in fact on an emergency run. Whether an emergency existed was relevant to the rights and duties of the driver of the ambulance, but the ordinance did not condition the duty of the driver of the bus upon the existence in fact of an emergency. His duty was to pull to his right and stop if the ambulance was giving a signal of its approach by siren which the bus driver heard or by the exercise of reasonable care should have heard. When a driver in the street hears the siren signaling the approach of an ambulance he cannot refuse to obey the ordinance on the ground that there was no real emergency.

█ Whether the driver of the bus in fact heard or saw the ambulance before entering the intersection is not disclosed. He did not testify and the record indicates that a summons for him was returned with the notation that he was not found. However, the jury had a right to conclude from the evidence recited above that had the driver been looking and listening with reasonable care under the existing circumstances he would have seen or heard the approaching

ambulance before he entered the intersection. They could have concluded from the evidence, including the map of the intersection and its approaches, that when the bus reached the cross-walk approximately 60 feet north of the center of the intersection where the collision occurred, its driver could have seen approximately 80 feet west of the center of the intersection in which space the ambulance was approaching with its siren sounding and its red light flashing.

The defendant argues that according to the evidence the bus was already in the intersection when the siren became noticeably audible and the blinker lights became visible, and that it was only then that anyone in the exercise of due care would have realized that the ambulance was approaching this particular intersection. There was evidence in support of that contention and the jury could have adopted that view. But there was also sufficient evidence to support the conclusion reached by the jury that the bus driver saw or heard or should have seen or heard the approaching ambulance in time to stop before entering the intersection. The choice was for the jury, not for the court to make as a matter of law.

■ Defendant next complains of the action of the court in allowing Lear, the ambulance driver, to testify that the Navy corpsman told him that this was an emergency run, the objection being that this was hearsay. The evidence was that the corpsman, who did not testify, was a member of the medical department of the Navy and had been assigned to take care of these patients in the ambulance. The doctor at the Naval Air Station who examined the patients and directed that they be taken to the hospital testified he did not declare either of the cases to be an emergency and gave no direction as to using the siren or blinker. The Norfolk ordinance quoted above does not in terms limit its application to ambulances engaged on emergency missions, but the preamble to the ordinance states that such was the inducing cause of amending the ordinance to include ambulances. However, as stated above, if the ambulance was giving audible warning of its approach then the ordinance prescribed the bus driver's duties and those duties did not depend on whether the ambulance was in fact on an emergency run. That question was material on the point of the ambulance driver's negligence (not imputable to the plaintiff) but not as to the negligence of the bus driver. The admission of this statement of the ambulance driver was at most harmless error.

Finally the defendant assigns error to the giving of Instructions 2

and 3 for the plaintiff. Instruction 2 told the jury that if the bus driver failed to keep a proper lookout he was negligent, and No. 3 told them that if he heard or should have heard the ambulance siren and then failed to comply with the ordinance he was negligent. Defendant says there was no evidence on which to base these instructions. As appears from what we have already said, the exception is not well taken.

The judgment appealed from is

*Affirmed.*